[Civ. No. 1463.     Third Appellate District.—November 24, 1916.]

PACIFIC POWER COMPANY (a Corporation), Respondent, v. STATE OF CALIFORNIA et al., Appellants.

EMINENT DOMAIN—SURVEYED SCHOOL LANDS WITHIN FEDERAL RESERVATION.—School lands situated within the boundaries of a federal forest reservation, which had been surveyed before they were included in the reservation, may be taken in eminent domain proceedings against the state.

ID.—RESERVATION OF STATE LANDS FROM SALE—RIGHT OF CONDEMNATION NOT AFFECTED.—The statutes of this state do not say that state lands reserved from sale, or state lands not offered for sale, shall not be subject to the right of eminent domain. They declare that all the lands of the state shall be subject to this right, saving such lands alone as are devoted to a public use.

APPEAL from a judgment of the Superior Court of Mono County.   W. S. Wells, Judge presiding.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and John T. Nourse, Deputy Attorney-General, for Appellants.

W. O. Parker, and J. D. Murphy, for Respondent.

BURNETT, J.—The action was brought in the superior court of Mono County for the purpose of condemning certain lands alleged to be owned by the state and situated within the boundaries of a United States forest reserve, to wit, the Stanislaus Forest Reserve.   The land is a portion of the southwest

quarter of section 16, township 2 north, range 25 east, Mt. Diablo base and meridian, and was included in said forest reserve by proclamation of September 7, 1906. All of the lands sought to be condemned were surveyed lands at the time of the creation of said forest reserve, and the state has applied to the United States for other lands in lieu of the entire southwest quarter of said section, but such lands have not been listed to the state.

Appellant states in its reply brief that "the case at bar is different from the Deseret case in that the offer of the state was actually accepted by the United States and other lands in lieu of the greater portion of the lands here under consideration, were listed to the state prior to the commencement of this action." In this statement appellant seems to be in error. The land described in the amended complaint is all located in the southwest quarter of said section and, according to the records in the surveyor-general's office, the state has offered to exchange said land for other lands, but the application is still pending in the general land office at Washington, D. C. It may be said, though, that under the decisions, the result would be the same in either case.

The status of school lands included within a federal reservation received able and elaborate consideration in *Hibberd* v. *Slack,* 84 Fed. 571, and *Deseret etc. Co.* v. *State of California,* 167 Cal. 147, [138 Pac. 981]. In the former, it is said: "In construing the act of February 28, 1891 ('An Act to amend Sections 2275 and 2276 of the Revised Statutes of the United States, [6 Fed. Stats. Ann., pp. 462, 464, 5 U. S. Comp. Stats. (1916), secs. 4860, 4861], providing for the selection of lands for educational purposes in lieu of those appropriated for other purposes') there are certain well-established principles of law applicable to school sections, which should be constantly borne in mind as follows: First, Title to a school section, if unencumbered at date of survey, then vests absolutely in the state. (*Cooper* v. *Roberts,* 18 How. 173, [15 L. Ed. 338]; *Heydenfeldt* v. *Mining Co.,* 93 U. S. 634, [23 L. Ed. 995].) And this is the principle recognized and acted upon by the Department of the Interior. . . . After title has thus vested, the section is not subject to any further legislation by Congress. Therefore, the school sections which were the bases of the selection of the lands sued for in the case at bar, although situated within the limits of forest res-

ervations, are not parts of such reservations. (*Wilcox* v. *Jackson,* 13 Pet. 498, 513, [10 L. Ed. 264]; *Hastings etc. R. R. Co.* v. *Whitney,* 132 U. S. 357, 375, [33 L. Ed. 363, 10 Sup. Ct. Rep. 112].) Second, until the surveys in the field of the school sections, to wit, 16 and 36, the United States has full power of disposition over them; and, by the exercise of this power, said sections may be lost to the state. Hence, and through various enactments of Congress, has arisen the law of indemnity, whose cardinal doctrine is compensation for loss. Thus, it has been said, the principle upon which indemnity is given to a state is for a loss. It is not given for that which the state has already received. (*Poisal* v. *Fitzgerald,* 15 Law Dec. Dep. Int. 19.)''

In the Deseret case, in reference to said United States statute, it is declared through Mr. Justice Henshaw: ''The federal grant was strictly an indemnity grant and nothing else. Such would appear manifest from a reading of the language of the federal statutes, and such is the decision of the circuit court of the United States in the carefully considered and elaborately reasoned case of *Hibberd* v. *Slack,* 84 Fed. 571, and the conclusion necessarily follows that a section such as this may not be *exchanged* with the United States under the indemnity grant provided for by section 2275 of the Revised Statutes of 1891.''

In the Hibberd case, it is to be observed, the matter of exchange had proceeded much farther than in the instant case. Therein the action was for ejectment and, as stated in the opinion, ''the complaint alleges that on the twenty-sixth day of May, 1893, the Surveyor General of California, acting as general agent of said state and under authority of the act of Congress of February 28, 1891, . . . selected said fractional quarter section, in lieu of certain sixteenth and thirty-sixth sections of school lands, which had been included within the limits of forest reservations created by order of the President of the United States . . . ; that this selection was accepted by the Commissioner of the general land office, under his interpretation of the aforesaid act of Congress of February 28, 1891; that on the fourteenth day of February, 1895, one Anders Paterson purchased said land from said state, and thereafter, for a valuable consideration, sold and assigned his certificate of purchase to plaintiff who is now the owner thereof; that on April 19, 1896, defendant, without authority

of plaintiff, and against his will, took and continues to hold possession of said land and excluded and now excludes plaintiff therefrom. The answer does not controvert the foregoing facts, but denies that said facts make plaintiff the owner of the land, or entitles him to the possession of the same. In the answer, the further defense is set up that two of the school sections which were the basis of the selections of the lands sued for were surveyed by the United States, before they were included within the forest reservations, and that the title to said sections thereupon became and still remain vested in the State of California.'' A demurrer to said answer raised the question which the court determined in favor of defendant, holding that the state of California was not entitled to select other lands in lieu of the sixteenth and thirty-sixth sections of school lands situated within the exterior boundaries of a public reservation where said sections were surveyed and became the property of the state prior to the date when the reservation was created. This conclusion was reached, notwithstanding, as we have seen, that the selection of the lieu lands was made by the surveyor-general of the state, that the selection was approved by the federal authorities and the land thus selected was sold for a valuable consideration to an innocent purchaser. It is based upon the theory that as to such surveyed school lands there exists no authority for exchange, that the attempted transfer was utterly void, and that of this infirmity in the title of the United States and of the state in and to the respective tracts a purchaser is charged with notice. However, it may be said as to this that the law contemplates in such cases that the purchase price of the scrip or land shall be refunded.

The Deseret case, *supra,* it may be remarked, was entirely similar in its facts to the case at bar. Therein, as here, the action was for condemnation of school lands included within the exterior boundaries of a forest reservation. The tract had been surveyed prior to said inclusion, and an application was pending before the general land office of the United States to have other land listed to the state in lieu thereof. It was declared to be beyond the power or authority of the land department of the government ''to give, to sell or exchange the public domain without authority from Congress,'' that Congress had not conferred such authority in reference to the land therein involved, and that the conclusion upon this

branch of the consideration, therefore, necessarily must be that while the state of California has by appropriate legislation offered to exchange such lands for other lands of the United States, there is no law of the United States authorizing such an exchange, and no act of the Congress of the United States taken in contemplation of any such exchange, present or future.''

The main proposition, therefore, of appellant, as to the title of the United States in and to the involved portion of said section 16 must be resolved in favor of respondent.

Another point made by the attorney-general is that section 3408b of the Political Code withdrew these lands from sale, and consequently from the operation of the eminent domain proceedings of the Code of Civil Procedure. The same position was taken in the Deseret case, *supra*, and it was answered by the supreme court in this way : ''A further argument upon the general subject is that the state has withdrawn such sections from sale and that therefore the right of eminent domain may not be exercised regarding them. This, however, cannot be in contemplation of the general law touching the right of eminent domain. Our statutes do not say that state lands reserved from sale, or state lands not offered for sale, shall not be subject to the right of eminent domain. They declare that all the lands of the state shall be subject to this right, saving such lands alone as are devoted to a public use. The state might to-day have no laws for the sale of its proprietary lands. But this would not affect the power to exercise the right of eminent domain as accorded by the statutes of the state.''

Likewise, the contention that this land was devoted to another public use by virtue of its having been included within the boundaries of a national reservation, and therefore exempt from the operation of the statute of eminent domain, is answered in the negative by said Deseret case from which we need make no further quotation.

One other question remains to be considered. Subdivision 2 of section 1240 of the Code of Civil Procedure, as it was when this suit was brought, provided that ''Lands belonging to this state'' might be taken for public use. By an amendment passed in 1915 the following proviso was added : ''Provided that all sixteenth and thirty-sixth sections, both surveyed and unsurveyed, owned by the state or the United

States, which may now or may hereafter be included within the exterior boundaries of a national reservation, or of a reserve, or within the exterior boundaries of lands withdrawn from public entry, shall be and are hereby withheld from the operation of this title and shall not be condemned as against the state or the United States.'' It is the claim of appellant that ''this amendment is a clear withdrawal of the right to sue as against the state or the United States for the purpose of condemning these lands.'' To this respondent answers: ''It is difficult to understand how this amendment shall be said to have any effect upon this case or the judgment given below for the reason that the judgment herein was filed and recorded in Mono County on May 29, 1915. The act amending Section 1240, C. C. P., was approved May 21, 1915. but did not go into effect until August 8, 1915.'' In the reply brief of appellant, the following statement appears: ''The judgment in this case having been had under a judicial interpretation of the effect of the Thompson Act which sustained the right to sue the state, and that judgment not having become final by reason of the appeal taken herein, the subsequent act of the state expressly and definitely withdrawing the right to sue the state in such proceedings, demands a reversal of the judgment by this court because at this time the right to sue the state having been denied, the right to enforce a judgment previously entered but not yet effective has been taken away.'' In support of this contention, the following cases are cited: *Messenger* v. *Kingsbury*, 158 Cal. 611, [110 Pac. 302] ; *Ayers* v. *Kingsbury*, 25 Cal. App. 183, [143 Pac. 85], and *Railroad Co.* v. *Alabama*, 101 U. S. 832, [25 L. Ed. 973]. In the first of these it was held that ''Since the enactment of section 3443a of the Political Code on March 25, 1909 (Stats. 1909, p. 774), further sales by the state of tide-lands forming the shore or bed of navigable waters is forbidden. If such lands had theretofore been offered for sale, the legislature, in passing section 3443a, manifested its intent to withdraw them from further sale under sections 3440 and 3443 of that code.'' The vital question was what effect said section 3443a had as to one who had made application to purchase such land before the section went into effect, but who had not paid the purchase price or any portion of it. The case was learnedly considered by Mr. Justice Sloss, the author of the opinion, and he declared: ''The disposition

of the public lands is a matter resting entirely within the control of the legislature and that body has the undoubted right to withdraw or reserve from further sale any part of the public domain. . . . Where a valid contract of sale has been entered into pursuant to law between the state and a purchaser so that an equitable interest in the land is vested in the latter, the state will, of course, be prevented by force of familiar constitutional provisions from destroying the right so vested. . . . But where there is no contract, and no vested right in the intending purchaser, the withdrawal of the land from sale by repeal of the statute authorizing sales or otherwise, absolutely terminates the power of the officers of the government to take the steps necessary to transfer title." The plaintiff not having made any payment, it was held that he had no vested right under the law that was repealed, and, therefore, the conclusion followed that it would be of no avail to compel the surveyor-general to file his application since the amendment had operated to withdraw the privilege to purchase such lands.

*Ayers* v. *Kingsbury,* 25 Cal. App. 183, [143 Pac. 85], is to the same effect. The additional point was decided therein that the deposit of twenty dollars required by the act of 1889 (Stats. 1889, p. 634) "was intended to be nothing more than a mere conditional deposit, and that the receipt to be given therefor does not become a part of the purchase price and cannot be accepted as such, before the application to purchase has been approved."

In *Railroad Co.* v. *Alabama,* 101 U. S. 832, [25 L. Ed. 973], certain statutes authorizing suit to be brought against the state on its contract were repealed. The proceedings in the case were begun while these laws were in force, but the repeal took place before the final hearing and thereupon the suit was dismissed for want of jurisdiction. The supreme court of the United States was called upon to determine whether the repealing statute was valid and constitutional so far as it affected the pending cause of action which accrued while the right to sue existed. Following the decision in a case from Tennessee, the court held that "under both the Tennessee and Alabama statutes the courts are made little else than auditing boards. If funds are not provided to meet the judgment, the courts are not invested with power to supply them. In Alabama, a warrant for the payment may be secured, but the

state may stop payment by withholding an application. . . . In neither state has there been granted such a remedy for the enforcement of the contracts of the sovereignty as may not, under the constitution of the United States, be taken away.''

The Tennessee case therein referred to is reported in *Railroad Co.* v. *Tennessee,* 101 U. S. 337, [25 L. Ed. .960]. In that decision it was held to be an elementary principle that a state cannot be sued in its own courts without its con-, sent, and that ''the right to sue which the State of Tennessee once gave its creditors was not in legal effect a judicial remedy for the enforcement of its contracts, and the obligations of its contracts were not impaired, within the meaning of the prohibitory clause of the constitution of the United States, by taking away what was thus given.'' It was said by the court: ''Here the State has consented to be sued only for the purposes of adjudication. The power of the courts ended when the judgment was rendered. In effect, all that has been done is to give persons holding claims against the state the privilege of having them audited by the courts instead of some appropriate accounting officer. When a judgment has been rendered, the liability of the state has been judicially ascertained, but there the power of the court ends. The state is at liberty to determine for itself whether to pay the judgment or not. . . . Everything after the judgment depends on the will of the state. It is needless to say that there is no remedy to enforce a contract if performance is left to the will of him on whom the obligation to perform rests.''

The foregoing as to the facts involved are manifestly quite dissimilar to the case before us. They have to do, however, with the question whether subsequent legislation is within the constitutional prohibition of the enactment of any law ''impairing the obligation of contracts.'' The difficulty, of course, is in making proper application of the principle to the particular case.

A later decision of the United States Supreme Court, *Pennoyer* v. *McConnaughy,* 140 U. S. 1, [35 L. Ed. 363, 11 Sup. Ct. Rep. 699], holds that ''an application for land, under the Oregon Act of 1870, was not rendered void by state act of 1878, where the first payment for the land was made within the time required by the former act; by such payment the contract with the state became executed so as to be protected

by the United States constitution against impairment by a
state law." "In other words," it was said, "by such pay-
ment, this contract with the state became so far executed as
to be embraced in the class of contracts protected by section
10 of article I of the Constitution of the United States, which
declares that 'no state shall pass any law' impairing the obli-
gation of contracts."

It is certainly a debatable question here whether plaintiff has
acquired such vested right in the land in controversy as to be
unaffected by the said amendment to section 1240. The rec-
ord does not show that it has paid anything for the land, and
it may be doubted whether it is in a position wherein it would
be inequitable to apply said amendment. The final order of
condemnation, as provided in section 1253 of said code, has
not been entered, and it may be that this contention of appel-
lant could be successfully urged against the entry of such
judgment or against its enforcement. But the question
should not be determined without fuller argument and more
deliberate consideration. This is an appeal from what is gen-
erally called the preliminary order of condemnation, and the
rule seems well settled that "the validity of a judgment is to
be determined by the laws in force at the time of its rendi-
tion and is not affected by subsequent changes therein." (23
Cyc. 674.)

In *Anderson* v. *Hygeia Hotel Co.*, 92 Va. 687, [24 S. E.
269], it was said: "This is not a court of original, but appel-
late, jurisdiction, and the writ of error must be disposed of in
accordance with the law as it existed at the time of the ren-
dition of the judgment. This court must affirm it, if there
is no error therein according to the law as it stood when the
judgment was rendered, and, if erroneous, reverse it and enter
such judgment as the circuit court ought to have entered."

In *Kansas Pacific Ry. Co.* v. *Twombly*, 100 U. S. 71, 79 [25
L. Ed. 950], it is said: "Neither can we, as is asked, send the
case back to the court below, with instructions to enter a
judgment of nonsuit, because, since the judgment below and
while this writ of error has been pending, the statute author-
izing the action has been repealed. A writ of error to this
court does not vacate the judgment below. That continues
in force until reversed, which is only done when errors are
found in the record on which it rests, and which were com-
mitted previous to its rendition. Here there are no such
errors." Therefore, the judgment was affirmed.

So here, under the decisions as we read them, there was no error committed by the trial court, and the judgment was one which was at least permitted by the statute in force at the time said judgment was rendered. The conclusion follows, that the judgment should be affirmed, and it is so ordered.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 22, 1917.